## Henrietta Irwin et al. v. Sarah Patchen et al., Appellants.

[Marked to be reported.]

*Will—Conversion of real estate.*

In order to work a conversion of real estate by will there must be either, 1, a positive direction to sell; or, 2, an absolute necessity to sell in order to execute the will; or, 3, such a blending of realty and personalty by the testator in his will as to clearly show that he intended to create a fund out of both real and personal estate, and to bequeath the fund as money.

Testatrix by her will directed as follows: " This piece of land I want disposed of as follows: The valuation of it when sold is to go to my

brother Orin G. Irwin, and my cousins, Harriet Elizabeth Irwin, Daniel Wilson Irwin and William Paul Irwin to share and share alike; and it is my sincere wish and desire that this piece of land be not sold until William Paul Irwin becomes fourteen years of age, and not then unless three fourths of the heirs, together with the executors, are agreed. In case of the death of any of the cousins, their share or shares of the piece of ground in Burnside borough is to go to whichever one of their parents that may be living, and if both be living they are to share it equally." *Held*, that the will did not work a conversion of the land.

*Trespass—Possession—Unimproved land.*

Where land is unimproved and unoccupied, the title carries with it the possession, and such possession is sufficient to maintain trespass.

*Evidence—Proof of execution of paper.*

When one of the parties to an instrument testifies to the fact of execution by himself and the other party, and that both the subscribing witnesses were dead, and that he had some acquaintance with the handwriting of one of the witnesses from having seen him sign for him, and that he had seen some of the handwriting of the other witness, who wrote the paper in question which the witness signed, it is sufficient to justify the admission of the paper.

*Evidence—Trespass—Tax receipts—Assessment books.*

Assessment books and tax receipts cannot prove title in trespass, but they are some evidence of claim, and are more or less efficient as a basis of inference, according as the opposing evidence of a similar character is weaker or stronger, and the other facts in the case are more or less consistent with the claim made.

*Evidence—Competency of witness—Party dead—Act of 1891.*

The act of June 11, 1891, P. L. 287, authorizes the admission of testimony of one of the parties to facts transpiring before the death of the deceased party or person, if the relevant matter occurred between the witness and some other living and competent person.

*Timber—Reservation of timber—Deed.*

In 1865, Patchen, by a verbal agreement, sold a tract of land to Kime. Kime subsequently, by parol agreement, sold the land to another person, reserving the timber. The vendee again sold the land, reserving the timber. In 1883, Patchen, the holder of the legal title, made a deed to one Irwin, who in 1868 had bought the equitable title with knowledge of the reservation of the timber. In 1883, Kime by agreement in writing sold the timber, the purchaser to have fifteen years, "from the date of a deed of conveyance made by Patchen to Irwin for the above mentioned piece of land, to cut and remove the above mentioned timber, free of charge." *Held*, (1) that after the agreement with Kime in 1865 Patchen had nothing to convey but the bare legal title; (2) that Kime's right to take off the standing timber was limited to the merchantable timber on the land at the time he sold it; (3) that any timber which grew into value on the land after 1868 was the timber of the owners of the land.

*Title to realty—Declarations—Estoppel.*

In the above case it was not improper to reject evidence that plaintiff lived near the land and saw the timber being cut and removed, and that she had said that the Patchen's estate owned the timber.

*Timber—Act of March 27, 1824—Trespass.*

If a defendant in an action for cutting timber trees under the act of March 27, 1824, § 3, 8 Sm. L. 283, who has a right to enter upon plaintiff's land to cut down certain trees, also cuts down other trees which he has no right to cut, as to such trees he is a trespasser, and liable under the act.

Argued April 18, 1894.    Appeal, No. 205, Jan. T., 1894, by defendants, from judgment of C. P. Clearfield Co., Sept. T., 1892, No. 358, on verdict for plaintiffs.    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, and FELL, JJ.    Affirmed.

Trespass to recover damages for alleged wrongful cutting of timber.    Before KREBS, P. J.

At the trial it appeared that, in 1864 or 1865, Aaron W. Patchen sold one hundred acres of land to William J. Kime, by a parol agreement without any reservation as to timber.    In 1865 or 1866 Kime, by parol agreement, sold the land to Jehu Gressly, reserving to himself all the oak, pine and hemlock timber.    On Jan. 9, 1867, Gressley sold the northwest half of the lot of land to Robert Smith by an agreement in writing. The writing contained this sentence : " Said Gressley reserves pine, white oak and hemlock."    Smith subsequently sold the land to W. C. Irwin.    The agreement of sale was indorsed upon the back of the agreement between Gressley and Smith, and was as follows:

" I sold the within named piece of land to W. C. Irwin in August, about the 10th, 1868, for a consideration of $75.00 cash, and transferred this article to W  C. Irwin.

"ROBERT SMITH, SR."

W. C. Irwin died intestate on March 3, 1870, leaving to survive him his children Mamie A. Irwin and Orin G. Irwin. Mamie A. Irwin subsequently acquired the interest of her brother in her father's estate by a sheriff's sale.    By deed dated Nov. 9, 1883, A. W. Patchen and wife conveyed to her the piece of land in controversy " hereby reserving all the oak, pine and hemlock timber on the above described tract of land, having previously sold the said timber to William J. Kime, with

the period of fifteen years to cut and remove the same free of charge." On Dec. 17, 1883, William J. Kime sold to Horace Patchen "all the oak, pine and hemlock timber" on this land, with this clause as to removal of the timber: "The said Horace Patchen is to have fifteen years from the date of a deed of conveyance made by A. W. Patchen to Mary A. Irwin for the above mentioned piece of land, to cut and remove the above mentioned timber free of charge." None of the prior agreements had any limit for removal of timber. Horace Patchen died intestate Dec. 23, 1885. Sarah Patchen is his widow and administratrix, and under her direction the cutting here claimed for was done in 1891 and 1892.

Plaintiffs claim through Mamie A. Irwin who died Oct. 26, 1887, leaving a will by which she directed, inter alia, as follows: "I own a piece of land in borough of Burnside, as a deed in my possession will show, from Aaron W. Patchen and wife, containing about forty-three (43) acres, bought on the 9th day of November, 1883. This piece of land I want disposed of as follows: The valuation of it when sold is to go to my brother Orin G. Irwin, and my cousins, Harriet Elizabeth Irwin (now Strouse), Daniel Wilson Irwin and William Paul Irwin, to share and share alike, and it is my sincere wish and desire that this piece of land be not sold until William Paul Irwin becomes fourteen years of age, and not then unless three fourths of the heirs, together with the executors, are agreed."

Robert Smith, a witness for plaintiff, identified his own signature to the agreement between himself and Gressley, and continued as follows: "A. Both the witnesses, 'Squire Riddle and John Fulton, are dead. . . . Q. Were you familiar with the handwriting of 'Squire Riddle? A. No, sir. I have seen some of it. Q. Did you see him write this article? A. I would be as positive as I am of anything that that article was written by 'Squire Riddle. I was present when John Fulton signed it. Mr. Murray: State whether you are familiar with the handwriting of 'Squire Riddle and John Fulton. A. No, sir. Q. You would not pretend to identify their handwriting? A. I don't recollect of ever taking notice of John Fulton's handwriting (except when he signed for me in any case). I have seen some of 'Squire Riddle's handwriting. Mr. Murray: We object to the agreement for the reason that there is no proof

whatever of the handwriting of the subscribing witnesses; the witness on the contrary states that he would not pretend to identify their handwriting, and the other evidence for the purpose of proving the execution of the paper is not sufficient. The Court: Objection overruled, evidence admitted and bill sealed for defendant." [1]

Plaintiff made the following written offer: Plaintiffs propose to prove by Mrs. Henrietta Irwin, one of the plaintiffs, that since 1884 Mamie A. Irwin and plaintiff have paid the taxes on this land, and that the same was assessed to them; that prior to 1884, and from the time of William C. Irwin purchase and since 1884, plaintiffs and their predecessors in title have had possession of said land.

Objected to by defendants: (1) That the witness is incompetent to testify to anything occurring prior to or on Dec. 23, 1885, at which time it is admitted Horace Patchen, the husband of Sarah Patchen, defendant (and of whom she is administratrix), died intestate, he being the vendee of William J. Kime, by agreement identified by the latter of the timber in dispute, and defendants being those to whom his title passed; and the witness, being both a party to the record, and interested adversely to the said Horace Patchen's title, is incompetent as stated. (2) It is incompetent and immaterial to prove payment of taxes on the land, for the purpose of affecting defendants' title, especially as the dispute relates wholly to the timber, and there is no proof in the reservations to which the testimony on part of plaintiffs relate, that the owner of the timber shall pay taxes thereon, and no proof of a separate assessment, and in fact no offer to prove a payment of taxes upon the timber as such. (3) The offer to prove possession of the timber is incompetent and irrelevant, because the proof is that the land is uncleared and unimproved, and also because the dispute relates wholly to the timber, and there is no offer to prove more than possession of the land.

The Court: Being of opinion that the proof of payment of taxes is relevant matter, and the same not appearing to have occurred between the witnesses and Horace Patchen, a deceased assignor, but in the presence or hearing of other competent or living witnesses or person, the act of June 11, 1891, is applicable and the witness competent. Objections overruled, evidence admitted, and a bill sealed for defendants. [2]

The witness stated that she paid the taxes from 1888 down.

The court, under objection and exception, admitted in evidence the tax assessment books showing annual assessments to Wm. Irwin's estate of "lands, 40 A." until 1886, when the entry was "Timber 40 A. Cleared," and so continued; also the minute book showing the record of resolutions of the commissioners fixing the taxes in the county. [3, 4]

Plaintiff then made the following offer: We now offer these tax receipts for money paid in 1885, 1886 and 1887, by Mamie A. Irwin, which have been identified by the plaintiff, Mrs. Henrietta Irwin.

Objected to: (1) Because there is no proof by the collector, or person who signed them, that they were paid, and they do not purport to have been paid by the party who has been offered as a witness in relation to them, and there is no proof of the execution of these receipts. (2) We object to them for the reason stated in our objection to the written offer. (3) As to the receipt dated January 25, 1885, there is nothing to show for what taxes the receipt was given, nor that there was any valid assessment of the taxes for the year to which it relates, and the taxes which were paid, or alleged to have been paid. (4) We object to the receipt of April 9, 1887, because it purports to embrace (besides county tax) borough, poor, school and building taxes for 1885, as to which taxes there is no proof whatever of an assessment. (5) We also object to the offer as being incompetent and irrelevant. The Court: The payment of taxes not being evidence of title, but only evidence of the bona fides of the claim to the property in dispute, we think these papers are sufficiently shown to be for taxes levied and assessed upon this land. We therefore overrule the objection, admit the receipts and seal a bill for defendant. [5]

Plaintiffs proposed to prove by E. B. Baird, that about 1867 or 1868, he worked for Wm. J. Kime, and cut and removed all the then merchantable timber on said land, i. e., oak and pine, and had to go onto the other lands to finish out the rate then made; further, to prove his experience as a lumberman; further, to prove that timber cut off this tract in 1891 and 1892, was not marketable or merchantable timber in 1867, or 1870, or in 1875. This is to be followed by proof of competent and experienced men, viz: John C. Connor, John W. Clark and

Martin Nichols, that they have examined the timber on the land in dispute, and now down and cut, and counted the growth of the same, and that said timber was not marketable or merchantable timber in '67, or ' 70 or '75, and therefore not within the reservation, and that said timber is second growth timber.

Defendants object to the offer : (1) Because plaintiffs have shown no title to the timber in dispute, the title of land being recited and referred to in the will of Mary A. Irwin, under whom plaintiffs claim, dated June 29, 1887, and probated January, 1888, as being shown by deed from A. W. Patchen and wife, then in her possession, not having been offered, and there being no title except by parol, for land which is unimproved and wild land. (2) Because it does not appear by the evidence now before the court that plaintiffs are entitled to fix any of the dates mentioned in the offer as the dates to which the testimony relating to the growth of the timber should properly be applied. (3) That the deed of Mary A. Irwin, above referred to and recited in her will, as her title, was in fact executed and dated Nov. 9, 1883, and contains a distinct reservation of the timber in dispute, and the agreement of Wm. J. Kime and Horace Patchen, identified by Wm. J. Kime, the plaintiffs' witness, under whom plaintiffs claim, was stated by him to have been made in December, 1883, and was in fact made on Dec. 17, 1883, and is for the timber in dispute. (4) It having been shown by Wm. J. Kime, the plaintiffs' witness, that he did not exhaust his reservation, but that on the contrary he only cut the timber for square timber, and did not cut any timber suitable for logs, and in fact cut no hemlock timber on the western end of the land purchased by him, the Irwins' end, and the testimony offered being in contradiction of that testimony already offered by plaintiffs, cannot properly be admitted.

Objections overruled, evidence admitted, and bill sealed for defendants. [6]

Defendants' proposed to prove by Geo. C. Moore, that he had charge of the cutting and removal of the timber, and that when removed it was hauled past the door of Henrietta Irwin, the plaintiff, who lived in the borough where the timber tract was, and in sight of it, and that she had knowledge of the cutting and removal of the timber, and made no objection thereto. This testimony is offered in connection with the deed of Nov. 9,

1883, to Mary A. Irwin, and her will reciting it, under which plaintiffs claim, and as bearing upon plaintiffs' right to maintain trespass, and to recover under the act of 1824, as declared on.

Objected to as incompetent and irrelevant, and also for the reason contained in former objection. Also, for the further reason that under the deed and reservation the defendants have no title to said timber.

Objection sustained, evidence excluded, and bill sealed for defendants. [7]

Defendants proposed to prove by Dr. G. F. Prowell, that about two months before Mary A. Irwin died, and about the time she appointed him one of her executors by the codicil of her will of Aug. 21, 1887, and spoke to him of the land on which the timber in dispute stood, and said that Patchens' estate owned the oak, pine and hemlock timber on said land, and that she owned other timber, and mentioned sugar, beech and chestnut timber as hard wood timber belonging to her, and told him Patchens were entitled to the timber under the deed from Aaron Patchen to her. This for the purpose of showing her recognition of the title of Patchens' estate, and of the deed of Nov. 9, 1883, as her title to the land, and the title of defendants to the timber in dispute. And also, as bearing upon the question as to the time from which plaintiffs are entitled to the growth of the timber. And also, as bearing upon plaintiffs' right to maintain trespass and to recover under the act of 1824, as declared for.

Objected to: (1) Because Dr. G. F. Prowell is an executor under the will of Mary A. Irwin, and as such interested therein, and cannot now testify and give an interpretation of her will to affect it in any way, or her title, or these devisees party plaintiff. (2) Because Dr. G. F. Prowell was her physician, and the said Mamie Irwin was taking large quantities of morphine and in bed at the time alleged.

The Court: There being no offer to show that defendants went upon the land to cut the timber under or on the faith of the alleged declaration of Mamie A. Irwin as to the timber she claimed, the declaration would not, in our opinion, estop her or those claiming under her, from recovering under the act of 1824, nor do we think the declarations made of time are such

as would destroy her title to the timber if she was otherwise legally entitled thereto. She would not be estopped by this declaration from asserting her title. For these reasons we reject the offer and seal a bill for defendants. [8]

The court charged in part as follows :

" [According to the paper I read from, W. C. Irwin acquired title to this land about the 10th of August, 1868. My recollection of the testimony is that he died on the 3d of March, 1870, so that from the 10th of August, 1868, up until about the 3d day of March, 1870, Mr. Irwin, so far as the evidence in this case shows, was the owner of this tract of land—the timber having been reserved prior to that time—and continued to own it up to the time of his death, on the 3d of March, 1870. There is no testimony showing that he went upon that land, or that he exercised any other acts of ownership than any man would who owned a piece of unseated or unimproved land.

" Upon the death of W. C. Irwin, the title to that land—or whatever title he had—would pass to his heirs. He left to survive him two children—Orin G. Irwin and Mary A. Irwin—who inherited that land. There is nothing to show what the ages of these children were at the time of their father's death, except the testimony of Mrs. Henrietta Irwin, who stated that Mamie A. Irwin would become twenty-one years of age sometime in the latter part of December, 1883. Between the time of the father's death and the death of Mamie A. Irwin, she became the owner of her brother's interest—her brother's interest in this piece of land was levied on and sold at sheriff's sale, and was bought in by her, so that she became the owner of it.

" When Mary A. Irwin made her last will and testament, she bequeathed this land to her three cousins, the children of Henrietta Irwin, the plaintiff in this case, and to her brother, Orin G. Irwin, and this vested it in them. Subsequent to the making of this last will and testament, and its probate, Orin G. Irwin sold his interest to William Coddington, and William Coddington and his wife sold and transferred it to Mrs. Henrietta Irwin. So that at the time of the bringing of this suit, the title to this particular piece of ground would appear to be vested in Mrs. Henrietta Irwin, and in her three children, in whom, by the devise, under the last will and testament of Mary A. Irwin, three fourths of this tract of land became vested.] [9]

" [You will observe, gentlemen of the jury, that at this time, prior to the death of Mamie A. Irwin, and in 1870, the date of the death of W. C. Irwin, and up until 1883, when this deed was made from Aaron Patchen, all that remained in Aaron Patchen, under the law, was the naked legal title. He had sold the land—he had been paid for it—but he had not made any deed, and therefore he held that legal title in trust for those who claimed under William J. Kime, or for William J. Kime and those claiming under him. He had nothing to convey except the naked legal title. He might possibly have repudiated that sale on the ground that it was a parol contract, and he was not bound to convey. It might be that because it was a verbal contract there was nothing to compel him, and that he was not bound to carry it out, but he did not take that position, and the defendants do not take that position now. He did afterwards make a deed conveying the legal title to Mamie A. Irwin, and the reservation, with reference to the timber that had been sold by him to W. J. Kime, was in that deed.] [10]

" [On the date when this deed was made—the 9th of November, 1883—Aaron Patchen had nothing to convey—so far as this tract of land was concerned—except the naked legal title, and that legal title he held in trust for Wm. J. Kime, and those claiming under him. He had no power, by any act of his, to put a reservation therein which would affect the rights of Wm. J. Kime and those claiming under him, unless these parties were brought into a relationship through some agreement between themselves, by which Mr. Patchen was then directed to make this reservation so as to make it binding upon them.] [11]

" [So that if any force can be given to this reservation, it is that it began to run when her father took the title to this land in 1868, and that the fifteen years—if it can be given any force at all—would attach, that is, the date would begin to run from that time, (August, 1868,) and would expire in August, 1883, which would be before this deed of the 9th of November, 1883, was actually made. And we go further than that, and say that this reservation—so far as Mary A. Irwin, and those claiming under her are concerned—is a mere nullity, for he (Patchen) had no power to put it in the deed, as he had nothing to reserve on this land. Her subsequent recognition of this deed, by her last will and testament, does not, in my judgment, add anything to the force of this reservation.] [12]

" [If he (Kime) did cut all the merchantable timber upon that tract of land—the pine, oak and hemlock—that was there at the time when Irwin acquired title—all that was fit for market or merchantable purposes—then he had nothing to convey to Horace Patchen in 1883, when he made this contract, and any timber that grew into value since that time—that was not marketable in 1868—was the timber of the plaintiffs in this case, and they would be entitled to recover its value.] " [13]

Defendant's points were among others as follows:

" 1. Under the pleadings and evidence in this case the plaintiffs cannot recover, and the verdict must be for the defendants." Refused. [14]

" 2. The plaintiffs having shown no sufficient title to either the land or the timber, under the deed from A. W. Patchen and wife, of Nov. 9, 1883, are bound by its terms, and under that deed and the other evidence in the cause, the plaintiffs cannot recover, and the verdict must be for the defendant." Refused. [15]

" 3. The deed to Mary A. Irwin, of Nov. 9, 1883, recited as set forth in her will made June 29, 1887, and also in the deed to Coddington, of Nov. 18, 1889, and in his deed to Henrietta Irwin, of July 17, 1890, operates to prevent the plaintiffs from claiming the growth of the timber as of an earlier date, and as there is no proof that any of the timber cut and removed by the defendants was not of sufficient size at that date to be covered by the reservation, the plaintiffs are not entitled to recover, and the verdict must be for the defendants." Refused. [16]

" 4. If the jury believe from the testimony that Mary A. Irwin, after she came of age, expressly and understandingly recognized the deed of Nov. 9, 1883, from A. W. Patchen and wife to her, and ratified it, then the plaintiffs cannot recover, and the verdict must be for the defendants. *Answer:* In answer to that point we say to you, that the only evidence, so far as we can remember in this case, of anything to indicate that she recognized this deed, is her will made in 1887, and that is not such a recognition of the reservation clause in this deed, as would estop either her, or those claiming under her, from claiming this timber, if she was otherwise entitled to have it." [17]

" 5. If the jury believe from the testimony that any of the

timber covered by the reservation remained upon the ground at the time of the cutting and removing complained of and that the defendants had then a right to cut and remove the same, then as they had a right of entry for the purpose of ascertaining their rights and of selecting the timber belonging to them, they are not liable in this action, and your verdict must be for the defendants. *Answer :* For the purposes of this case we refuse that point. Of course they would not be liable for timber which they had a right to cut, or a right to take ; but if they cut and took timber which was not within the limits of their reservation, then they would be liable in this action." [18]

Verdict and judgment for plaintiff for $347.

*Errors assigned* were (1–8) rulings on evidence ; (9–18) instructions ; quoting bills of exception, evidence and instructions.

*Thomas H. Murray, Frank G. Harris* with him, for appellants.—The parol contract was within the statute of frauds and perjuries, and vested no title in Mary A. Irwin, testatrix. To take a parol contract for the sale of land out of the statute, there must be proof of possession taken in pursuance of the contract, and the possession must be of an exclusive and notorious character : Hart v. Carroll, 85 Pa. 508 ; Tammany v. Whittaker, 4 Watts, 221.

Whether under the act of 1824 or not, there must be either title or actual possession to maintain trespass quare clausum fregit : Wickham v. Freeman, 12 Johns. 183 ; Leland v. Tousey, 6 Hill, 331 ; Holmes v. Seely, 19 Wend. 509 ; Rifener v. Bowman, 53 Pa. 313 ; Hughes v. Stevens, 36 Pa. 320 ; Wilkinson v. Connell, 158 Pa. 126.

The will of Mary A. Irwin conferred no title upon plaintiffs, but only a right to the proceeds : Miller v. Meetch, 8 Pa. 425 ; Morrow v. Brenizer, 2 R. 185 ; Allison v. Wilson, 13 S. & R. 330 ; Allison v. Kurtz, 2 Watts, 185 ; Churchman v. Wright, 3 Penny. 149 ; Miller v. Com., 111 Pa. 321 ; Jones v. Caldwell, 97 Pa. 42.

A deed for land accepted by the vendee after articles of agreement, though it differs in some respects from the article, is to

be considered as expressing the ultimate intent of the parties, where there is no misconception of the deed by either party : Crotzer v. Russell, 9 S. & R. 78; Connellogue v. English, 8 W. & S. 12; Schenley v. Pittsburg, 104 Pa. 472.

The terms of the reservation cover the timber on the land at the date of the deed of Nov. 9, 1883 : Cox v. Freely, 33 Pa. 124.

One claiming under a deed is bound by the reservations and recognition of title in another which is contained in it : Olwine v. Holman, 23 Pa. 279; Burford v. Burford, 29 Pa. 221.

There was no legal proof of the execution of the contract of Jan. 9, 1867 : Abbott v. Plumbe, 1 Doug. 216; 1 Greenl. Ev. §569; Rex v. Harringworth, 4 M. & S. 353; Himes v. Barnitz, 8 Watts, 55; Kitchen v. Smith, 101 Pa. 452.

A naked receipt for taxes is not evidence even if properly identified, unless there be proof of a corresponding assessment.

Timber trees are such trees as are useful, and used not only for the purpose of building, but in the mechanical arts, in the construction of keels of vessels, chairs, plows, axe handles and rakes : Lewis, Cr. L. 506.

The acts and declarations of parties are to be considered as giving construction to their agreements : Colder v. Weaver, 7 Watts, 466; Dexter v. Lathrop, 136 Pa. 588; Butz v. Ihrie, 1 Rawle, 218; Bonbaugh v. Miller, 82 Pa. 209.

If the right of entry be not determined, trespass cannot be maintained : Boults v. Mitchell, 15 Pa. 371; Narehood v. Wilhelm, 69 Pa. 64; Wheeler v. Carpenter, 107 Pa. 271.

In Shiffer v. Broadhead, 126 Pa. 260, also in 134 Pa. 539, the contract was dated on Oct. 18, 1867, and was for " all the white pine and hemlock timber (and no other) now being, standing or growing upon that certain lot of land," etc. : Dexter v. Lathrop, 136 Pa. 587.

*Smith V. Wilson, James H. Kelley* with him, for appellees.— The owner of wild and uncultivated land is to be deemed in possession, so as to maintain trespass, until an adverse possession is clearly made out : Miller v. Zufall, 113 Pa. 325; Mather v. Church, 3 S. & R. 513; Ward v. Taylor, 1 Pa. 238; Baker v. King, 18 Pa. 138.

The will of Mamie A. Irwin contained a mere discretionary power, and, under the authorities, does not work a conversion :

Peterson's Ap., 88 Pa. 397; Jones v. Caldwell, 97 Pa. 42; Perot's Ap., 102 Pa. 255; Hunt & Lehman's Ap., 105 Pa. 141; Stoner v. Zimmerman, 21 Pa. 398; Anewalt's Ap., 42 Pa. 417; Tammany v. Whitaker, 4 Watts, 221.

The reservation in the deed of Nov. 9, 1883, was without effect: Crotzer v. Russell, 9 S. & R. 78; Close v. Zell, 141 Pa. 405; McGowan v. Bailey, 146 Pa. 579.

The agreement of Jan. 9, 1867, was sufficiently proved: Wilson v. Van Leer, 127 Pa. 377; 1 Greenl. Ev. § 577.

We went further in our proof on the question of the admissibility of the tax receipts than we believed the law required. They were not offered to prove a title, but as evidence of our claim: Hockenbury v. Snyder, 2 W. & S. 252; Kelsey v. Murray, 9 Watts, 113; Sailor v. Hertzog, 10 Pa. 317; McClure v. Jones, 121 Pa. 562; Patterson v. Dushane, 137 Pa. 23; Rothrock v. Gallagher, 91 Pa. 108.

The offer of testimony contained in the 7th and 8th assignments was clearly inadmissible as its purpose was to prove what Mamie Irwin said with reference to her timber when she appointed Dr. Prowell executor, and also that George C. Moore hauled timber past Mrs. Irwin's door: Willard's Ap., 63 Pa. 329.

Defendants were trespassers: Shiffer v. Broadhead, 126 Pa. 260.

OPINION BY MR. JUSTICE GREEN, Oct. 1, 1894:

We think it very clear that the will of Mary A. Irwin did not work a conversion of the land therein described as situate in the borough of Burnside and containing about 43 acres. The clause of the will which devises this land is as follows: "I own a piece of land in Borough of Burnside, as a deed in my possession will show, from Aaron W. Patchen and wife, containing about forty three (43) acres, bought on the 9th day of November, 1883. This piece of land I want disposed of as follows: the valuation of it when sold is to go to my brother Orin G. Irwin, and my cousins, Harriet Elizabeth Irwin, Daniel Wilson Irwin and William Paul Irwin to share and share alike; and it is my sincere wish and desire that this piece of land be not sold until William Paul Irwin become fourteen years of age, and not then unless three fourths of the heirs, together with the executors, are agreed. . . . In case of the death of any of

the cousins, their share or shares of the piece of ground in Burnside Borough is to go to whichever one of their parents that may be living and if both be living they are to share it equally."

In the case of Hunt and Lehman's Appeal, 105 Pa. 128, it was said by Mr. Justice PAXSON, delivering the opinion: "It ought to be settled by this time that, in order to work a conversion, there must be either: 1st. A positive direction to sell; or, 2d. An absolute necessity to sell in order to execute the will; or, 3d. Such a blending of real and personal by the testator in his will, as to clearly show that he intended to create a fund out of both real and personal estate, and to bequeath the said fund as money."

In Perot's Appeal, 102 Pa. 235, the words of the will were: "I further authorize and empower my said executors to make sale in their discretion of any real estate for the purposes of this trust and to make deeds to the purchaser or purchasers thereof without any liability on the part of the purchasers to see to the application of the purchase money." We said: "This is a mere discretionary authority and under the authorities does not work a conversion: Peterson's Appeal, 7 Norris, 397; Jones v. Caldwell, 1 Outerbridge, 42."

In Stoner v. Zimmerman, 21 Pa. 394, the words of the will were: "I direct that my executors either sell all my real estate (which I hereby fully empower them to do, and convey in fee simple), and divide the amount arising therefrom between my wife, etc., or to have it proportioned and valued by three judicious and disinterested men, so as to accommodate as many of my children as it will allow of, if it be their wish at that time to have it done so." We said of these words, KNOX, J.: "To convert land into money, the direction to sell must be absolute and unconditional. In this case, the sale by the terms of the will depended upon the choice of the widow and children of the testator. In the absence therefore of a positive direction to sell, the estate retained its original character as land, and so passed under the will."

In Anewalt's Appeal, 42 Pa. 414, we said, THOMPSON, J.: "The following, taken from the books, may be received in the aggregate, as a full statement of every requirement under the doctrine: 'To establish a conversion the will must direct it absolutely or *out and out*, irrespective of all contingencies.'

" ' The direction to convert must be positive and explicit, and the will, if it be by will, or the deed, if it be by contract, must *decisively fix upon the land the quality of money.*' 'It must be an imperative direction to sell; ' " citing a number of authorities.   Proceeding, Justice THOMPSON further said : " The sale directed here depended upon several contingencies; in such case the rule is that no conversion results from the law, and does not take place until it is actually made."

Recurring now to the language of the will we are considering, it is to be observed that there is no direction to sell given to any person.   The only mode in which a direction to sell can be deduced from the words of the devise is by implication. The only source of the implication is the words " The valuation of it when sold is to go to my brother," etc.   Sold when ? Sold by whom ?   Sold in what circumstances and upon what occasion ?   A sale might be made by the devisees jointly, consistently with this language, but there are no words conferring upon them such a power.   There is absolutely nothing upon which to found any implication that the executors were to sell or might sell.   The only connection in which they are even alluded to is in a prohibition of any sale, " until after William Paul Irwin becomes fourteen years of age, and not then unless three fourths of the heirs, together with the executors, are agreed."   The only function possessed by the executors is a right to agree to a sale conjointly with three fourths of the heirs.   But if that proportion of the heirs do not agree, the executors have no function at all.   They could not sell if they desired to, because the will, instead of permitting them to sell of their own motion, positively prohibits them from selling without the consent of three fourths of the heirs, and does not authorize *them* to sell even in that event.   In addition to the absence of any order to sell, the will particularly directs that there shall be no sale until at least three contingencies have happened, all of which are of uncertain character.   (1) William Paul Irwin must have attained fourteen years of age. (2) Three fourths of the heirs must have agreed to the sale, and (3) the executors must also agree.   Who the persons are who are *heirs*, is altogether indeterminate.   There are four persons who are devisees of this land.   Whether the testatrix considered that these were her heirs because they were her de-

visees of this land, we cannot tell. It might be so or it might not. They were a brother and three cousins. She names in her will as legatees an uncle Matthew Irwin, an aunt Susan Eason, and she refers to parents of her cousins who are devisees, and gives them the interests of the cousins in the "piece of ground in Burnside Borough," in the event of the death of the devisees or any of them. In this last clause of the will the shares of the cousins are described as "shares of the piece of ground," and the devise over to the parents of the cousins is a devise of the land itself and not of shares of valuation money. As the possible sale was not to occur except with the consent of three fourths of the heirs and also of the executors, it follows that if these consents or either of them are withheld there could be no sale, and therefore the very existence of the power depends upon a contingent and an uncertain event. In point of fact the land never was sold, up to the bringing of this suit, and the suit was brought by the devisees because it was still land and they alone had any interest. We are bound to assume therefore that the contingencies mentioned in the will never transpired, that the prerequisite consents never were given, and hence no conversion under the will was possible. The cases above cited cannot be reconciled with any possible theory of conversion.

As to the proposition that the plaintiffs had not actual possession of the land and therefore could not maintain trespass for cutting the timber, it is sufficient to say that, under all the authorities, if they were the owners of the title, the land being unimproved and unoccupied in any way, the title carried with it the possession, and such possession was sufficient to maintain the action. In Miller v. Zufall, 113 Pa. 317, we said : "It is well settled law that the owner of wild and uncultivated land is to be deemed in possession so as to maintain trespass until an adverse possession is clearly made out: Mather v. Trinity Church, 3 S. & R. 513 ; Ward v. Taylor, 1 Pa. 238 ; Baker v. King, 18 Id. 138." Speaking of the plaintiff's right in that case we said : " He had an indubitable right of possession, and in contemplation of law was in the actual possession. This gave him a right to maintain trespass for injury done thereon. It lies not in the mouth of a trespasser to defend by reason of the plaintiff owning only an equitable estate : McCurdy v.

Potts et al., 2 Dallas, 98.   His equitable title was sufficient to maintain the action against a wrongdoer. . . . A warrant for unimproved land gives to the owner of it a constructive possession of the land, which will enable him to maintain trespass for digging ore thereon, against one who has not an actual adverse possession of the land : Baker v. King, 18 Pa. St. 138."

We are of opinion that, so far as the construction of the will of Mary A. Irwin, and the question of possession in the plaintiffs as affecting their right to maintain the present action are concerned, there was nothing in the way to prevent a recovery, if on the other questions arising their right of action could be sustained.   In reference to these matters the facts are of a somewhat complicated character, but after a patient and careful reading of the charge of the learned court below, we are satisfied the case was correctly tried.   Much of the controversy arose over the deed of November 9, 1893, from A. W. Patchen to Mary A. Irwin.   It is certainly true that when that deed was made Patchen had nothing to convey except the naked legal title.   Notwithstanding the rather numerous sales of the land or the timber, made in the interval between 1864, when A. W. Patchen acquired his title, and November 9, 1893, when he executed the deed to Mary A. Irwin, there never had been any actual conveyance of the legal title.   Of course he held it in trust for the lawful owner, as was said in the charge.   When he made a parol sale of the land to W. J. Kime, in 1864 or 1865, no writing of any kind passed between him and the grantee, who testified explicitly to that effect on the trial.   Nevertheless he says he paid most of the purchase money to Patchen and cut timber, pine, oak and hemlock on the land and then sold to Gressly by a written article of agreement which was lost and not given in evidence.   Gressly sold to Smith by article of agreement dated January 9, 1867, which was put in evidence on the trial.   Kime testified that when he sold to Gressly he reserved all the pine, oak and hemlock on the tract, and when Gressly sold to Smith he reserved the " pine, white oak and hemlock," and this appears on the face of the article.   This agreement therefore operated only on the land and not on the timber, the title to which, or so much as had not been cut off, was still in Kime.   Up to this time no one had questioned the validity of the verbal sale by Patchen to Kime ; on the con-

trary the transactions of the parties fully recognized it, and proceeded upon the presumption of its validity. On the back of the article between Gressly and Smith there was the following writing : " I sold the within named piece of land to W. C. Irwin in August about the 10th, 1868, for a consideration of $75.00 cash and transferred this article to W. C. Irwin. Robert Smith, Sr."

This was the origin of the title of W. C. Irwin. No deed had been made by A. W. Patchen up to this time, August, 1868, to any one. Smith being examined as a witness on the trial, testified that he sold the land to W. C. Irwin, in August, 1868, and also that when the deed came to be made he would be willing it should pass over him and be made directly to Irwin. He testified : " I said that if when the deed came through Kime and Gressly, that I had no objection for it to pass me, as it would save me the trouble of making it to Irwin. By signing the article in full I gave him full possession of what I owned. I bought it in full and paid for it and I received payment for it." Gressly testified that when he bought from Kime he bought for $100, which he paid, only the land and not the timber, that he sold the part in question to Robert Smith, and that he agreed that as Kime had not made the deed to him he might make it to the person he, Gressly, sold it to.

We think it entirely clear therefore, that the parol sale from Patchen to Kime was recognized and observed all the way through from Patchen to W. C. Irwin, that the reservations of the timber were made, not to assert any new right but merely to enforce the original reservation made by Kime, and because the subsequent purchasers of the land considered they had no title to the timber. This was said by the learned court below in the charge and answers to points with entire correctness as we think. It results, then, that when Smith sold to W. C. Irwin, Kime remained the owner of the timber if it was not cut off, or of so much timber as was merchantable at the time of the reservation, and was not cut off. This raised two questions of fact which were carefully left to the jury, whether it had all been cut off, and, if not, whether any, and how much, that was merchantable at the time of the reservation, which was in 1866, 1867 or 1868, was still left. If there was any of the latter which was cut by the present defendants, the jury

were instructed it was rightfully cut, and there could be no recovery for it in the present action. A considerable amount of testimony was given on this subject and it was all left correctly and with careful instructions to the jury. Now W. C. Irwin died in March, 1870, having acquired his title in August, 1868. He left two children, Mary A. Irwin and her brother Orin G. Irwin, and to these two the land descended under the intestate law. Mary A. Irwin subsequently acquired her brother's title by a purchase at sheriff's sale. No conveyances of the land were made between August, 1868, and November 9, 1883, and at the latter date A. W. Patchen made the deed to Mary A. Irwin. The deed contained the reservation of the timber in the following words: " The said party of the first part hereby reserving all the oak, pine and hemlock timber on the above described tract of land, having previously sold the said timber to William J. Kime, with the period of fifteen years to cut and remove the same free of charge." As a matter of course this was not a reservation in favor of Patchen as he had sold everything, land and timber, to Kime in 1864 or 1865, and he did not assume to reserve anything to himself. The reservation was for the benefit of Kime or his grantees if he had any, but as he never sold the timber to any one prior to November 9, 1883, he was the sole beneficiary. But if he had removed all the timber that was merchantable at the time of the reservation made by him, there was nothing upon which the reservation in the deed from Patchen to Mary A. Irwin could operate, and it was of no effect as against her. If there was any of that kind of timber still left it belonged to the defendants under the subsequent deed made by Kime to Horace Patchen in December, 1883, and to this effect the court below instructed the jury correctly, as we think.

These views dispose of all the assignments of error except those which relate to admission and rejection of testimony. As to the first, we think that when one of the parties to the instrument testified to the fact of execution by himself and the other party, and that both the subscribing witnesses were dead, and that he had some acquaintance with the handwriting of one of the witnesses from having seen him sign for him, and that he had seen some of the handwriting of the other witness, who wrote the paper in question which the witness signed, it is suf-

ficient to justify the admission of the paper. He testified to the fact of his own signature, and that he was present when John Fulton, one of the subscribing witnesses, signed it, and that the other witness wrote the body of the paper. The reception of the instrument in evidence was largely in the discretion of the trial judge, which we see no occasion to question: Wilson v. Van Leer, 127 Pa. 371.

Several assignments relate to the admission of certain assessment books and tax receipts. Of course such testimony cannot prove title, but they are some evidence of claim, and are more or less efficient as a basis of inference, according as the opposing evidence of a similar character is weaker or stronger, and the other facts in the case are more or less consistent with the claim made.

In Hockenbury v. Snyder, 2 W. & S. 240, speaking of a claim under the statute of limitations, we said: " The assessment is resorted to not as giving him a right but to show the extent of his claim and possession. . . . I apprehend then that, where paying taxes for a tract, or the whole tract, is spoken of, it has reference to the extent of the claim, and is referred to as evidence of that extent."

The present litigation is chiefly a contest about timber, or land with timber on it. Some of the assessments are for land only, others are for timber land. How far they would affect the question of the plaintiffs' claim for timber or timber land would be for the jury. Three of the tax receipts for 1885, 1886 and 1887 were receipts to Mamie Irwin, and were objected to, because the payment of the money was not proved by the person who paid it, or the one who received it, but the court held that, not being evidence of title, but only evidence of the bona fides of the claim to the property in dispute, the papers were sufficiently shown to be for taxes levied and assessed upon the land. We think there was no error in this. The other payments were proved by the person who made them. That person was Henrietta Irwin, one of the plaintiffs, whose competency was objected to on account of the death of Horace Patchen, under whom the defendants claimed. He died December 23, 1885, and these payments were all made after that time. The court below was of opinion that under the act of June 11, 1891, P. L. 287, she was competent, as she was not testifying to anything that occurred between her and Horace Patchen but in

the presence or hearing of other living or competent persons. In this we think there was no error. The act authorizes the admission of testimony of one of the parties to facts transpiring before the death of the deceased party or person, if the relevant matter occurred between the witness and some other living and competent person.

We do not see how the testimony as to the extent of the timber cutting, and the growth of timber after the right reserved was exhausted, could have been withheld from the jury. There was sufficient evidence of the facts to submit to the jury, and upon the plaintiffs' theory of their right to recover, the testimony was competent.

We think the learned judge of the court below was entirely right in charging the jury that A. W. Patchen had nothing to convey but the bare legal title, when he made the deed of Nov. 9, 1883, that he could not bind W. J. Kime by any reservation he chose to put in the deed, that Kime's right to take off the standing timber was limited to the merchantable timber on the land at the time he sold to Gressly, and that any timber which grew into value on the land after 1868 was the timber of the plaintiffs.

The fact that Henrietta Irwin saw the defendants hauling timber from this land past her door, without objection, would not divest her title if she had it, and it was therefore immaterial. So too the fact that Mary A. Irwin told Dr. Prowell that Patchen's estate owned the oak, pine and hemlock timber, could not divest her title if she had one, nor could it create a title in Patchen's estate. As for the recognition of the deed of November 9, 1883, that was abundantly done in her will, but, as we have already said, Patchen could not convey anything but the legal title, and he could give nothing to Mary A. Irwin by reservation or in any other way, more than the naked legal title. Therefore there was nothing upon which the proposed declaration could operate. It was Kime's reservation and the effect of it, that was in controversy, and that was not, and could not be, affected by these rejected declarations. We think the answer to the defendant's fourth point was entirely correct. Mary A. Irwin could certainly not be estopped from claiming the timber by any manner of recognition of the Patchen deed if she was otherwise entitled to it. She had a right to have the deed for the conveyance of the legal title, and it was not in Patchen's

power to take away her title to the timber if it arose extrinsically to the deed.

We see no error in the answer to the defendants' fifth point. The defendants' right could not be greater than a right to cut such timber as belonged to them, and that the answer gave them. Certainly they would be liable if they cut timber not within their reservation, and that was the whole substance of the court's ruling, and it is fully sustained by our decision in Shiffer v. Broadhead, 126 Pa. 260.

Judgment affirmed.